May it please the Court, Henry Kaplan of Bennett-Hartman representing the petitioner's felons in this matter. I'd like to reserve five minutes for rebuttal if I may. Before I begin, I noticed over the weekend that the ER references in the reply brief were incorrect. I don't know the cause, but we will promptly provide the Court with a corrections sheet for those references. The essence of our claim is really rather simple. The 1978 decree that was issued by Judge Solomon mandated a certain level of benefits as a remedy for a Title VII violation. In 2003, the Oregon legislature reduced those benefits. But what case did Solomon cite? Excuse me? What case did Solomon cite as authority? For the 1978? For his decision. It was based on the Manhart case. The 1978 consent decree, though. Yeah, but who did Solomon know who was involved in the Manhart case? Oh, that was you, Your Honor. See how life comes around? What year was this? The original case, the opinion in which he cited your Manhart decision was 1975. And what did the Supreme Court do with it? With the Manhart case? Yeah. It affirmed the decision. Thank you. Go ahead. That was the last time. That was the last time. In any case, in 2003, the Oregon legislature reduced the benefits retroactively from that decree. And the petitioners seek a declaratory ruling that the retroactive change was a violation of the 1978 decree. And so the first question is, what exactly did the 1978 decree require, and has PERB met that requirement? There must be at least a dozen cases in this circuit which state that you analyze a consent decree as you would analyze a contract. Therefore, I'd ask this Court to put aside for the moment the fact that the state of Oregon is one of the parties to this contract and consider only how this language would be analyzed as part of an ordinary contract. That inquiry divides up, of course, into two familiar categories. First, what is the meaning of the plain language? And second, the evidence of what the parties understood that language to mean. The previous Ninth Circuit panel that looked at this case held that the language was ambiguous, but it didn't look at the extrinsic evidence because the issue before them in that case was on a motion for contempt, and therefore they restricted their analysis to the four corners of the decree. However, the evidence of what the parties actually understood is very one-sided. That understanding is shown by three extrinsic sources. First of all, the minutes of the PERS board meetings in which this case was discussed. Second, the affidavits of the people involved in drafting and enforcing the settlement. And third, a comparison of the 1978 decree with the 1976 injunction. Let me talk about that, the last one first. If you compare the language of the 1978 decree to the 1976 injunction that it superseded, the primary difference is in the third paragraph. It's reasonable to infer that the third paragraph does something extra, something not accomplished by the 1976 injunction. The district court says, well, they just picked an implementation date, but that can't be right. The new language says that the new annuity rates will now only apply to people retiring after July 1, 1978, and, quote, thereafter, they will receive those topped-up rates. It says thereafter you will receive a rate identical to the refund identity annuity retirement. Yes. It doesn't say it shall be no less than. It says identical. Now, under your interpretation, does that mean they can't increase it? Well, the district court made that point as well in its opinion. It seemed concerned about the use of the word identical because, obviously, PIRB later raised its rates above the 1978 rates, so they were no longer identical because they were better. I would say that this is at best a hyper-technical concern. If you look at the minutes of the PIRS board when they talked about entering into this settlement decree, their main concern was raising the female rates to match the male rates as of July 1, 1978. That's what their language was intended to implement. The use of the word identical in this context is like a pension plan requirement that an employer say match pension contribution. Obviously, the employer can give more without violating the matching requirement. And even if PIRB was correct that there was a technical violation later when PIRB in 1993 raised the rates above that, the most that that would prove was that some members may have later received a windfall as a result of a violation of the decree after 1992. Well, we're trying to figure the intent of the decree. And it would be easy to do what you said. If it read, thereafter shall provide a monthly refund annuity, retirement allowance to all members, which shall be no less than the refund annuity. That would accomplish what you want. Right. But this is female members will get it identical to male. The intent of the- Let me just interrupt for a minute. Excuse me? In my initial decision, I did order that the women, Department of Water and Power of the City of Los Angeles, receive retroactively a sum of money to bring them up to par with men. The money they lost. That's correct. And the Supreme Court said no. Well, that's a different point. The Supreme Court- Yeah, I know. They said no. The Supreme Court said in the Manhart case- And then remember this. The only dissent that the Ninth Circuit had, in my opinion, came from Kilkenny, who used to sit up here. That's right. So the-well, I'd like to get to the point about the topping up of the benefits in a moment. Just to finish with the question, Judge Runhart's question about the identity language. Let's assume, just for the sake of argument, that there was later a technical violation of the decree when the interest rates were later raised. Well, it's not just a question of a technical violation. It's a question of what this language was intended to do. It wasn't intended to maintain a cap on this, which is- No, it wasn't intended to maintain a cap. Yeah. But that's the way I think you're reading this. You say it's got to be identical to the-and meaning a floor. And I think that the intent of this decree is best shown by the minutes. The minutes do not really reflect that there was an intent that the 1978 rates be both a floor and a ceiling. If you look at the minutes, it's very clear that they intended that the female rates be raised to the male rates so that they would get-and the word identical in this context is in the context of similar cases must be treated the same. For example, the litigants knew that there are lots of different tables depending on which survivorship options you chose. It would be cumbersome to say female option zero gets traded the same as male option zero for the same years of service and retirement age. It's much simpler to say, well, the Norris case, which I cited in the brief, says-basically had a similar decree which says similar cases will be treated alike. This one was intended to be a little more specific. If you look at the minutes of the PERS board, however- The minutes? Yeah. I think it's 171. Of what? 171, 172, I think are the most pertinent pages of the minutes. Okay. The appellant's initial excerpt of record, volume two? In the bottom portion, it says, yes, Mr. Hart indicated that this would be- Wait, I'm still trying to find them. Hold on. I want to see if I have the right volume.  171, 172. Yes. The minutes of May 25, 1978. Where is that on that page? What are you looking at? Well, towards the bottom half of the page, in light of the Manhart decision, Mr. Hulsher indicated that the board must decide, one, to continue to contest this application to Oregon's benefit format in the Ninth Circuit. Second, negotiate a consent judgment with the plaintiffs based on the seeming intent of the Manhart decision. You're not on 171, are you? I'm sorry. Yes, I'm on 171. Okay. In the middle of the page. Middle of the page. Middle of the page, yes. Or three, have the Ninth Circuit hear the existing cleaning in its normal course, risking the issue of retroactivity. And then skip a paragraph and it indicates what the actuary reported would happen if they considered unisex tables out of blended tables or topping up the tables to the mail rate. And he indicated that there would be an employer rate increase if they topped up the mail tables. In the middle of that last paragraph, it states, Mr. Hulsher questioned the legality of such a reduction in benefits. To resolve the matter, the board directed Mr. Hulsher to attempt a negotiated consent judgment with the plaintiffs, agreeing to increase the female annuity factor to that of the mail rate, effective July 1, 1978, and thereafter. Okay. And then the motion of the board is the ---- It's also, he says, negotiated consent judgment of an increase of female annuity to that of the mail rate, meaning to equalize them. Equalize them. Effective then and thereafter. Equalize them at the July 1, 1978 rates. Now. At that point. At that point. Now, if you look at the language of the consent decree, there's two ways that you could possibly interpret it. Option one is that from July 1978 onward, everyone is paid at the mail rate. Let me find that. The consent decree itself is under 50. They are 51. Hold on. And it's your position that the consent decree is not ambiguous? Well, we believe that the consent decree, the ambiguity, there may be some ambiguity in the consent decree, but not, but you can't stretch that ambiguity to the interpretation that the defendants in the State are advocating. You could say, okay, from July 1978 onward, everyone is going to get paid at the mail rate, no matter where the mail rate goes. Top it up to the mail rate forever. Option two, top it up to the mail rate on July 1, 1978, and from then on, pay everybody at that rate, which is the cheaper of the two options, and that is the option that everyone involved in the case says was intended, and reflects indeed how PERS applied this language for two decades. The defendants say, no, there's an option three. Pay males and females the same, and then just let the rates fluctuate with life expectancy tables. In other words, their option three is just implement the 1976 injunction, but with a 30-month delay. So option three would basically mean that the plaintiffs gave up 30 months of liability for nothing. Option three would have, would enable PERS to lower the rates below the July 1978 mail rates as soon as the ink was dry on the decree, without violating it. I think the minutes of the PERS board make it very clear that they didn't consider that to be an option that they were binding themselves to at least pay. But the purpose of all this was to equal male and female rates. Well, there's two purposes. One, of course, was to equalize the male and female rates. That had already been accomplished by the 1976 decree. But the second purpose, the one that the 1978 decree accomplished, was it vacated the 1976 decree. It eliminated that retroactive liability based upon the 1976 decree, but topped up the rates to the male rates from July 1, 1978 forward. The 1976 decree would not have required a topping up of the rates. The 1978 decree clearly required a topping up of the rates. Any way you read that ambiguous language, and that- The rates of July 1, 1978. And indeed, that is how PERS interpreted that language, how PERS administered its fund for the next 12 years. Now, tell me, what was the legal status of these problems at the time? Wasn't there a general view that you couldn't reduce the rates legally until there were some developments that then made it apparent that you could? Well, as the record reflects, the PERS attorney advised the board that they could not legally reduce the rates, the male rates, because to do so would be a violation of Oregon trust law. And that was the accepted view until the 2003 legislature came along and reduced everybody's rates. And then, of course, that spawned several pieces of litigation besides this one. So there really wasn't an issue about being able to reduce the rates at the time of the consent decree? The assumption of the parties was that you could not reduce the male rates without violating state law. Yes. In fact, that's a representation that they made, that the state made to Judge Solomon in the briefs. And, in fact, in one of the briefs, the representation was also made that because they recognized that problem, they therefore incorporated what they thought was already the law into the consent decree. Well, that's correct. It may have been originally because of state law that they decided that they needed to do that, but by incorporating that into the consent decree, it became part of the consent decree, whatever the original reason was. And I said that. Tell me, once the Oregon law changed, even if your view were correct, would the defendants not have been able to go to court and modify the consent decree? Yes, they would have. And, indeed, when we first started these proceedings, the defendants filed a motion for modification. Petitioner's position was and always has been that there's nothing wrong with a prospective modification of the decree. The remedial purpose of the 1978 decree has been served. A prospective modification, which only applies the new rates to newly earned benefits, would be completely acceptable. And, in fact, that is what PERS did by administrative rule in 1999. Nobody complained about that administrative rule because it had only a prospective application. This change has a retroactive application. This change means that Petitioner Eileen Schaffer, who was one of the people working in, who was in PERS in 1978, who was working side-by-side with males who were going to receive the July 1, 1978, rates, when she retires, will not receive those rates. And the males who retire won't either, will they? Excuse me? Nor will the males who retire? That's correct. Nor will the males who retire. And so the remedial effect, the retroactive application of this change undercuts the remedial effect of both the 1976 injunction and the 1978 consent decree. I'd like to save a little time for rebuttal. Explain that again, would you? Explain that. Give me an example. Well, the example of the petitioner who would have read this decree in 1978 and seen the males around her retiring at a higher rate, and then the decree itself orders that she will be able to retire at that same rate when she retires. And then 20 years later, she's about to retire, and she no longer will get the And similarly, the male who worked next to her, who thought there would be a higher rate because that's what there was. Well, there was no higher rate for the males. The males did not receive any increases as a result of it. No, no, but he thought he would retire. Let's say he was at a $100 rate, and she thought, I'm going to be at a $100 rate because I'm going to be brought up to the male. Well, those that retired at the time, indeed anybody who retired before the now, let's say, would receive $80, both your client and the male who worked next to her. That's correct. There's no question that if the decrees did nothing else, they equalized the female and male rates forever. But the tradeoff in 1978 was we will leave you a $15 million worth of retroactive liability under the 1976 decree if you, in exchange for topping up of the rates to the male level from here on. But what did the Supreme Court say about that? The Supreme Court. What about making it retroactive? Well, the Norris case, which I discussed in the brief. What did they say in Manhart about that? And that was a case that came five years later, if I may have a moment. The Norris case also involved the Title VII challenge to a state pension plan, under which women received lower monthly benefits than the men had received, making the same contributions. What did Manhart say about this? Supreme Court opinion. The Manhart case said in that particular set of facts under Manhart, there was no requirement of a retroactive award. Well, they reversed my retroactive award. Yes. See? Right. I was going to give the women all the money they were denied, which was a decent thing to do. But they said, no, don't do that. But in this case, there was already an injunction in place in 1976 that was going to end the cost. But the implementation of the injunction was stayed pending the appeal. Once the appeal was over, there would be retroactivity at least from January 1976 until 1978, and 30 months of retroactivity on the original 1976 decree. Would the male employees get the same benefit then? The male employees had already received that benefit continuously from January 1976 to July of 1978. The females had received nothing because the implementation of the injunction was stayed pending appeal. Once the case was over, the females would have been able to go back and say, okay, now that the case is over, the 1976 injunction means that the state owes me this money. How much money are we talking about? $6 million a year, total of about $15 million. And that's in the record. Per person. Excuse me? Per person. No, no, for the entire system. I know, I know. But how about your client? I wouldn't know. Fairly small amounts. I would agree that it would probably be fairly small amounts over that period of time. In the NARS case, the Supreme Court said that the district court should have inquired into the circumstances of which plans after Manhart could have applied sex-neutral tables to the pre-Manhart contributions of female employees and similarly situated male employees without violating any contractual rights of the males. In other words, NARS case talked about the situation in Oregon, and it said that, and then the court remanded the case to determine whether the male participants who had not retired at the time of Manhart had a contractual right to a particular level of benefits. The clear implication was. Listen, you've run over your time. Okay. Thank you. Thanks. Good morning. May it please the Court. The issue before you this morning is the meaning of the 1978 consent decree. The parties agreed that you were to construe the decree based upon Oregon law, and the leading case in Oregon on construction of contracts, which would apply in this case is Yogeman v. Parrott. That case says you begin by looking at the text and the context of the consent decree. I want to talk initially about the context. This was a Title VII case. The claim in the case was that the State of Oregon, through its public employees retirement system, was discriminating against women by paying them a refund annuity that was less than the refund annuity paid to a similarly situated male, the same issue that was presented in the Manhart case. Why did they call it a refund? It's a refund because there are two elements to the pension that a PERS member receives. One is a pension provided by the employer through the employer's funds, and the other is an annuity based upon the amount of money that is in the member's account through their contributions. That's significant because the definition of a refund annuity is a monthly stream of income that is the actuarial equivalent of the amount of money that is in the member's account. If you pay, as PERS did for many years, an annuity that is based upon outdated mortality tables, the money in the member's account will run out before the member has exhausted his actuarial life expectancy. And that was the problem that led to litigation in the late 90s brought by employers who challenged the practice of PERS of using outdated mortality tables. The Circuit Court of Marion County, the Legislative Assembly and House Bill 2004 passed in 2003, and the Oregon Supreme Court in the Strunk case all said that Oregon law in 1978 and always up to the present time has required that the refund annuity be paid in an amount that is the actuarial equivalent of the money in the member's account, and that the PERS did not have the authority to use outdated mortality tables in calculating that benefit. They didn't have that authority in 1978. They didn't have it in 1990. And according to the Oregon Supreme Court, they didn't have it today. So the question is in a Title VII case. Does that mean if the opponent were correct about the consent decrees, construction, that that would have been entered into without authority? Yes, that's exactly what it means, Your Honor. The Public Employees Retirement Board does not and did not have the authority to agree to pay a pension amount in excess of what the statutes provided, and the Oregon Supreme Court made that clear in Strunk as well, and they made it clear that the statutes provide for a refund annuity that is an actuarially equivalent amount. I'm not sure we have to get to that, but that's an interesting question. If the State agrees in a consent decree to do something it doesn't have authority to do, where would that leave us? Yeah. Your Honor, I actually think that you don't reach that question because I don't think that the consent decree can be construed as plaintiff suggests. One of the reasons that you should not construe the consent decree as plaintiff suggests is because if you do, you are construing it in a way that means that the Public Employees Retirement Board didn't have authority to make that promise in the first place. Although it thought it did. That's right. But you don't even need to get to that question because if you begin with the context, the issue in the case was equality of benefits, not the amount of benefits. And what the plaintiff wants to do is to construe the decree as setting a floor for benefits. As your question to my colleague pointed out, you can't get there from the language because the language doesn't say no less than the male benefit in 1978. It says that it is identical. There's another issue that's at least interesting to note, which is that at least one of the petitioners that is before you today is a man. And if you read the consent decree literally, it speaks only to the benefit that will be paid to women. And yet the petitioners here contend that it set a floor of benefits not only for the women who were the plaintiffs in the case, but for men as well. So you believe that the consent decree, the language, is ambiguous? We argued in the district court that it was not ambiguous and that it unambiguously only sets the date and the method by which benefits will be equalized. I believe that's correct. So we don't have to look at the extrinsic evidence? I'm sorry. I missed the first part. I said so we do not have to look at the extrinsic evidence. Well, as I said, that was our argument below and what we've argued consistently. However, in a prior decision by this court where the plaintiffs, the petitioners, were seeking an order to show cause why the perp should not be held in contempt, as Mr. Kaplan pointed out, this court said that the language is ambiguous and so you get to extrinsic evidence. But before you get to extrinsic evidence, I would suggest that you first ought to be examining the context. Part of the context is this was not a class action. And Mr. Kaplan says there was a quid pro quo for perp's agreement to set a floor for benefits forever and all time at the male-only 1978 mortality tables. However, none of the plaintiffs in the original case were retired. There's no evidence that they were we know that they weren't retired when they filed the lawsuit in 1974. There's no evidence that any of them had retired between 1974 and when the consent decree was entered in 1978. So there was no retroactive liability for the plaintiffs to give up. And because the plaintiffs had not proceeded as a class representative in a class action, they could not bind any other PERS retiree to give up retroactive liability. So to the extent that there was a quid pro quo for the bargain that the petitioners' hearsay was made, the petitioners or the plaintiffs in the original case were giving perp the sleeve out of its vest. There was no protection whatsoever against retroactive liability. Now, the petitioners say, well. Scalia, what expression did you use? Sleeve out of the vest. Vest. Selling the sleeve out of your vest. Never heard that before. Meaning that there was none. How do you do that? Well, you can't. I mean, unless you find somebody who is foolhardy enough to be willing to buy something that is really nothing, which is what, according to Mr. Kaplan's argument, the plaintiffs sold to the public employer. Why don't you stick to the Brooklyn Bridge? That's easier for us to understand. Sleeve out of the vest. Oh, I see. Sleeve out of the vest. I apologize if my metaphor bogs us down. The point is that they say that they were giving up, that the plaintiffs were giving up retroactive liability. They didn't have any retroactive liability to give up. He says, well, you had a judgment that was entered by Judge Solomon in 1975, and you could have gone back to 1975 with retroactive liability. Again, he's not talking about any of the plaintiffs, because there's no evidence that any of them retired, but arguing that some other retiree could have said, well, I want benefits back to 1975. But if you look at Judge Solomon's original opinion, and by the way, he not only cited your Manhart decision. What he said was, I agree with Judge Pregerson's careful analysis of Title VII and the conclusions for which he came. This was a good guy.  He always showed good judgment, Your Honor. But in the same opinion at ER 156, after saying you've got to equalize the benefits for men and women, he also said, nevertheless, injunctive relief should be stayed. Both sides have announced an intention to appeal an adverse decision. The State should not be required to adopt unisex tables until and unless this decision is upheld on appeal. He said that in his original opinion. It wasn't that he issued an injunction and then granted a stay. He understood that we were dealing with an issue somewhat novel at the time, and that both your decision and his decision ultimately were embraced by the United States Supreme Court. Now, let's talk about what the words say. If you look at ER 51, it's pretty clear that the paragraph upon which the Petitioners relied did three things. E-R 51 or E-R 50? You know, Your Honor, I don't have the excerpt of record. It's on page 7 of the green brief. It's the paragraph 3 of the consent decree. That's E-R 50. I apologize. That's all right. What the Court did in that decree is two main things. It established the date on which mortality tables would be equalized, and it established the method that would be used for equalizing them, that is, adopting the male tables rather than the female tables or a blended table. And as the district court pointed out in this case, both the date on which the equalization would occur and the topping up, the method that would be used, were negotiated items. The court could have ordered that equalization would happen at some later date, or the court could have said it would be at some date earlier, given the fact that apparently none of the plaintiffs had yet retired at that point. It made sense to have the date run from the date approximately of when the decree was entered. And with regard to topping up, counsel says, well, if you don't conclude that the parties and the court intended to impose a floor for benefits forever and all time based upon the 1978 male tables, then the rest of that paragraph is surplusage. But it isn't because it identified the method. Instead of adopting blended tables, it would top up to the male tables. There's nothing in that sentence that can be read to support the conclusion, a novel conclusion in the context of a Title VII case, that you're going to continue to use male-only 1978 mortality tables on into the future regardless of what happens to mortality. If there had been a cure for cancer discovered in the 1980s and life expectancy rose to 120 or 130 years, according to the petitioners here, this consent decree obligated the State of Oregon to continue to pay an annuity that is supposed to be an annuity. You have to continue to pay as if people had life expectancy that men in 1978 had. Counsel says there was a quid pro quo that we gave up the or agreed to a floor of benefits in order to save the potential retroactive liability. And if you look at the minutes to which counsel cited, it's clear that PERB had some concern about exposure to retroactive liability. But it's also clear when you look at the record in the original case that we knew that once Manhart was decided by the United States Supreme Court, this case was coming back to Judge Solomon one way or another for him to decide how to implement his prior conclusion that you had to equalize tables. And I think it's reasonable for PERB to look at that and say, well, if we continue to fight the appeal and continue to make arguments that we may not prevail on and we come back to Judge Solomon rather than recognizing that he had accurately predicted what the United States Supreme Court would do, he might at that point decide to impose some liability that would carry retroactive exposure. So the fact that they were concerned about and talked about retroactive liability does not lead to the conclusion that they agreed to this bargain whereby they fixed a floor for benefits for men and women forever and all time. Counsel says that there was a course of performance by the Public Employees Retirement Board after 1978. It is true that between 1978 and the end of the 20th century, the Public Employees Retirement Board had a practice of only changing actuarial factors if the effect of the change would be to increase monthly benefits for members. It is also true, and the record in this case I think is pretty clear, that they did that because of what turned out to be bad legal advice that under Oregon law they could not change those actuarial factors in a way that would cause the monthly benefit to go down. We know now, based upon the strunk decision from the Supreme Court and the legislature's action in House Bill 2004, that it was perfectly appropriate, in fact, that HERB was required to update its actuarial factors. But there's not one shred of evidence in this record that the reason they did not update the actuarial factors is because they were concerned that they were obligated not to do so because of the Solomon Decree. But it wouldn't have been all that surprising if they had put in this decree something they thought they were bound to do anyway. Well, I don't think that either the plaintiffs or the defendant thought that this consent decree was accomplishing anything particularly momentous. All it was doing was setting forth the equalization requirement, which was the objective of the litigation. But what I'm suggesting is had they just intended to equalize, it would not have been surprising had they said we're going to equalize it at this rate, which won't be reduced, because that was their understanding of what the law required. Well, it would be surprising if they did that in using the language that is contained in the consent decree. That's a different question. Because, as you pointed out, it doesn't say no less than. It sets it as the requirement forever and all time, according to the plaintiffs. As a floor and a ceiling. That's right. And the fact of the matter is that the plaintiffs, the Petitioners here, are just trying to use this decree in a way that it isn't, as a matter of common sense, can't really be forced to accomplish what they want to accomplish. The furthest thing from either the plaintiffs or the defendants' mind in 1978 was the idea that they were going to lock in a certain floor of benefit. This was a case about equality, not about the amount of the benefit. And today, it is still a case about equality, not about the amount of the benefit. Let me just ask, counsel, there is a concern about the evidence and whether certain paragraphs contained in declarations should have been properly stricken. Is that not an issue that either side feels needs to be addressed? Well, I'll address it since you asked about it. As pointed out in PIRB's brief, which the interveners adopted on that, your review of the evidentiary ruling by Judge King is for abuse of discretion. The statement by legal counsel to PIRB made 30 years after the fact, telling you what the law was and what the court had in mind when it entered the decree, is simply not competent evidence. Mr. Kaplan has an argument that it was offered to show context or something like that, and to the extent that that's what it's offered for, it really doesn't inform your decision about what the consent decree means. So your position is that it should be stricken as legal conclusions as the trial judge did? Yes. I want to say the public employers, there's evidence in the supplemental excerpt of record of Judge Lipscomb's decision in the city of Eugene case in which he found that it was unlawful for PIRB to use outdated mortality tables, and he rejected the arguments that PIRB gave for why they were using outdated mortality tables. I commend that to you because he says nothing in his opinion about the decree, the consent decree by Judge Solomon. If, as the Petitioners contend here, PIRB believed throughout the period of time that we're talking about that they were bound by Judge Solomon's decree, surely they would have gone into the Marion County Circuit Court and said, Judge, we can't update the mortality tables because there's a Federal court order that says we can't. They didn't do that. They didn't do that because they didn't believe that they were bound in the way that the Petitioners seek to bind them. And finally, I come back to the point that came up in the colloquy with Judge Reinhart earlier, which is it is crystal clear under the Strunk case that the Public Employees Retirement Board does not have authority to agree to set benefits at a minimum level, and if that's what they did in this 1978 decree, then the 1978 decree was beyond the authority of the Public Employees Retirement Board to enter. And as this Court did in Washington v. Penwell and other cases, you should conclude, therefore, that the decree would be unenforceable as interpreted. I think the better ruling would be that it doesn't mean what the Petitioner says it means. Thank you. Thank you. You're over your time. I'll give you one minute, if you can handle that. Thank you very much. I heard counsel say that part of the implementation, the language of the decree, was to implement this by topping it up to the male rates. Obviously, that is what everybody acknowledges was intended, and it was to remain at those rates thereafter. That is what the thereafter language means, that it was a rate-setting agreement and the rate set and it required that those rates be implemented from that point forward. Now, counsel also indicated that he thought that to the extent that it did that, it would have been a violation of the Court's authority to agree to that. We discussed the Kempthorne case in the briefs, which I think disposes of that contention, and having myself had the tremendous privilege of having clerked for Judge Solomon once upon a time, I find it difficult to comprehend the assertion that Judge Solomon would have said I didn't, would have accepted the notion that he didn't have the authority to enter into this kind of decree and to enforce it, especially because this is exactly the type of decree that would have been contemplated by the NARS case and that a Federal Court could have entered into if it found that there were contractual rights that formed a base level for the Title VII equalization. Thank you. Thank you very much. The matter will stand submitted. We'll come to McLeod versus Lucchesi. You know, we've got 20 minutes aside here. I think 10 minutes aside ought to do it. What? Yeah, 10 minutes is enough.
judges: Pregerson, Reinhardt, Marshall